Ervin Eugene TILBURY, Jr., Appellant,

v.

The STATE of Texas, State.

No. 2–93–361–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 21, 1994.

J. Rex Barnett, Douglas T. Emerson, Nekhom, Barnett & Emerson, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall, Asst. Chief Appellate Sec., Sylvia Mandel, Jay Lapham, Brock Groom, Asst. Crim. Dist. Attys., Fort Worth, for appellee.

Before HILL, C.J., and FARRIS and HICKS, JJ.

## OPINION

HICKS, Justice.

Ervin Tilbury pled not guilty to a charge of cruelty to animals. The jury found him guilty and the trial court assessed punishment at six months in jail, probated for twelve months. Tilbury assigns three points of error: (1) the evidence is insufficient to show he knew the two dogs he shot and killed were "domesticated"; (2) he was egregiously harmed by the trial court's failure to require the jury to find that he killed or injured two dogs, knowing they were "do-

mesticated living creatures"; and (3) the trial court erred by overruling Tilbury's objection to the State's argument maligning his attorney.

We affirm.

In his first point of error, Tilbury asserts the evidence is insufficient to show he knew the dogs were domesticated. Uncontested evidence from several witnesses showed that people would dump unwanted pets in the area and wild dogs frequently roamed the neighborhood, causing problems for the local residents.

In reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed in the light most favorable to the verdict. *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Moreno·v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988).

"This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

Sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense evidence outweighs the State's evidence. *See Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991); *Wicker v. State,* 667 S.W.2d 137, 143 (Tex. Crim.App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson,* 819 S.W.2d at 846.

The pertinent parts of Tex.Penal Code Ann. § 42.09 [1] (Vernon 1994) provide:

(a) A person commits an offense if he intentionally or knowingly:

. . . .

(5) kills, injures, or administers poison to an animal ... belonging to another without legal authority or the owner's effective consent. . . .

. . . .

(c) For purposes of this section, "animal" means a domesticated living creature and wild living creature previously captured. "Animal" does not include an uncaptured wild creature or a wild creature whose capture was accomplished by conduct at issue under this section.

*Id.*

Tilbury testified that· he shot and killed two dogs later identified as an Alaskan Malamute and a one-half Labrador retriever under the following circumstances. Tilbury, his wife and four children lived in a mobile home in a neighborhood with one-half acre to one acre lots. The neighborhood, in unincorporated Tarrant County, was surrounded by countryside. Wild dogs frequently roamed the area and the Tilburys' property, sometimes traveling in large packs, but more often in groups of two or three. They were mainly medium to large sized dogs; some with collars, some without. Dogs had gotten under the Tilburys' mobile home and ripped out insulation; they had dug up the vegetable garden. They urinated and defecated in the yard. Some were friendly. Occasionally though, one or more would threaten Tilbury but they had not threatened his children. Tilbury had called the Sheriff's Department trying to get something done about the problem but this was a low priority for the Department. Although they never told him he could shoot the dogs, they did tell him he had a right to defend his person and property.

On the evening of June 10, 1991, Tilbury was working at his desk at home when his four-year-old son, Michael, went outside to play. About five minutes later, Michael came in the house, "tears streaming from his eyes, kind of whimpering and crying. He was a little dirty, and he had been scratched a little bit." Michael said something about "mean" dogs. Tilbury went outside to look. The Labrador and Malamute were urinating

---

1. At the time of trial, this statute was numbered § 42.11.

and defecating in the yard. He yelled at them and threw gravel at them to get the dogs to leave. But instead of leaving, one dog snarled at him with his tail lowered and the other followed suit.

Generally, yelling and throwing gravel worked but occasionally Tilbury would have to get his BB gun and shoot into the air or ground to get rid of the dogs. That June evening, the BB gun was not in its usual place, so Tilbury grabbed his twenty-two caliber rifle and went back outside. At first he did not hear or see the dogs but then he heard banging and crashing in his shed behind the house.

When he went to investigate, Tilbury saw the dogs in his shed, running around, knocking over boxes, breaking things. From ten feet away, Tilbury yelled a couple of times trying to get the dogs out. The dogs stopped running around, came out to the edge of the shed and stopped. They dropped their tails, bared their fangs and started growling. Then they "came after" him. Knowing he was about to be attacked, he shot at the dogs two times. The dogs ran away and Tilbury went in the house. Thinking he might have hit one of the dogs, Tilbury went back outside to look for it. He found the Labrador hurt pretty badly. Tilbury shot the dog one more time to put him out of his misery. He did not get close to the dog until he shot him the second time because he was afraid the wounded animal would attack him.

Tilbury called the Humane Society to see if they would pick up the dog's body. When they replied negatively, Tilbury put the Labrador's body in a dumpster and called the Sheriff's Department to report the shooting.

Tilbury did not think he had shot the Malamute but the evidence showed it died of a gunshot wound later that night.

Tilbury had seen the Labrador before, perhaps in the company of a small pack of dogs. He had not seen the Malamute, did not know the dogs' owner, and he believed these were wild dogs. Tilbury said he never saw a collar on either dog. The evidence showed the Malamute had very bushy hair with such complete coverage its owners did not notice

the gunshot wound and believed the dog was ill. The Labrador was brown and had on a brown collar.

Sheriff's Deputy Mitchell Morgan related Tilbury's description of the events quite differently. After talking to Tilbury, he felt Tilbury had called the Sheriff to have the dog's body picked up. Morgan testified that Tilbury said he shot the dogs because they were urinating and defecating in his yard. Tilbury had thrown a rock at them and they just looked at him. Tilbury felt threatened by the way they looked at him, so he went into his house and got a rifle. The dogs were just sniffing around the metal building when he shot them. He didn't feel threatened at that time, and the dogs were twenty-five feet away.

Morgan related that Tilbury said, after he shot the Labrador, the dog walked over to a tree and sat down. Although the dog just looked at him, Tilbury shot him again from a foot away, hitting him at least three more times. Morgan showed Tilbury the dog's collar. Morgan counted approximately seven bullet holes in the dog's body. Finally, Morgan said Tilbury seemed most upset when he told Tilbury dog-killing was a crime and he would have to file charges if the owners were found and wanted to press charges.

While Morgan was at the Tilbury residence, the dogs' owners, the Terry Fortson family, drove up looking for the Labrador with the Malamute in the back of the car.

Terry Fortson also testified that the dogs both had on collars and were friendly, nonthreatening dogs. He kept them penned up but they had gotten loose.

Tilbury argues the evidence is insufficient to show he knew the dogs were "domesticated living creatures" because it is only illegal to shoot a domesticated animal as defined in section 42.09 of the Penal Code. The State takes the position that all dogs are domesticated animals and Deputy Morgan so testified. However, Deputy Morgan also agreed that numerous calls were made to his department reporting dogs running wild and he acknowledged that pet-dumping was a problem. The State also maintains it did not have to prove Tilbury knew the dogs he shot

at were pets; it does not matter whether he saw their collars.

■ We conclude the evidence is sufficient to show the dogs were domesticated—the uncontested testimony of their owner proved that. We also hold the evidence is sufficient to show Tilbury knew the dogs were domesticated animals. They were both wearing collars. Their owner testified to pet-like demeanors and they lived nearby. Tilbury admitted to having seen the Labrador previously. The jury was free to disbelieve some or all of Tilbury's testimony and conclude he did know the dogs were pets.

Furthermore, in determining the sufficiency of the evidence to show a defendant's intent and faced with a record that supports conflicting inferences, we:

> must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.

*Matson,* 819 S.W.2d at 846 (quoting from *Farris v. State,* 819 S.W.2d 490, 495 (Tex. Crim.App.1990)). We overrule the first point of error.

In his second point of error, Tilbury alleges the trial court reversibly erred because it charged the jury on both result and conduct regarding the defendant's mens rea. Actually though, it appears Tilbury is complaining that the application charge did not make it clear to the jury that the State must not only prove Tilbury intentionally and knowingly injured the dogs but also that he knew the dogs were domesticated. The State argues such knowledge is not a necessary culpable mental state for this crime.

The pertinent part of the application paragraph reads:

> Now, if you find from the evidence beyond a reasonable doubt that ... Tilbury ... did intentionally or knowingly kill or injure two dogs by shooting them with a firearm and without the effective consent of ... the owner thereof, and that such animals were then and there domesticated living creatures, then you will find the defendant guilty as charged.

As pointed out by the State, however, the charge in this case was rather unique. First, it charged the jury on the defense of necessity, essentially telling the jury to acquit Tilbury if it found, or had a reasonable doubt, that Tilbury believed his actions were immediately necessary to avoid a greater harm. This charge mandated acquittal if the jury believed Tilbury's version of the events and thought his behavior was reasonable. Then, if the jury did not acquit on this theory, it was instructed to acquit the defendant if it found Tilbury acted under a mistake of fact that the animals were not domesticated but were wild, or if it had a reasonable doubt about Tilbury's mistake of fact.

■ We conclude we need not determine whether the trial court erred in failing to require the jury to find that Tilbury knew the dogs were domesticated before it could convict because Tilbury suffered no egregious harm.

Because appellant did not object at trial to the error in the court's charge, we may only reverse if the error was so egregious and created such harm that Tilbury did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *See Saunders v. State,* 817 S.W.2d 688, 692 (Tex.Crim. App.1991); *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g); *see also* TEX.CODE CRIM.PROC.ANN. art. 36.19 (Vernon 1981).

In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza,* 686 S.W.2d at 171. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Id.* at 174.

As discussed above, the only issues in this case were whether Tilbury reasonably felt imminently threatened by the dogs and whether he believed they were wild dogs. The trial court placed the burden on the State to prove Tilbury did not reasonably feel he was in imminent danger and he did not reasonably believe they were wild ani-

mals. Neither party has cited us to any pertinent case stating how the trial court should charge on the knowledge of domestication issue. We hold the jury charge obligated the State to shoulder the entire burden, and, if it was erroneous, no harm came to Tilbury as a result. The second point of error is overruled.

In his third point of error, Tilbury contends the trial court erred in not granting his motion for mistrial based on the following excerpt from the State's closing argument:

And as Counsel Emerson indicated, he is not required to prove any evidence. And he is not. He is not required to bring any evidence in here. *Actually, what Mr. Emerson and Mr. Barnett [defense counsel] do, what their duty is, what they do is they try to muddy the waters.*

[DEFENSE COUNSEL]: Objection, Your Honor.

It's striking at the defendant over the shoulders of the counsel.

THE COURT: Sustained.

[DEFENSE COUNSEL]: We would request a motion to disregard.

THE COURT: Don't pay any attention to that last statement.

[DEFENSE COUNSEL]: Your Honor, the statement is so egregious, an instruction cannot cure it. It goes to the basic right of any citizen to be represented in a court-of-law by a counsel. Since it is so egregious, an instruction cannot cure it, we ask for mistrial.

THE COURT: I will deny your motion for mistrial.

[PROSECUTOR]: *In essence, what they have done is tried to manufacture reasonable doubt where there is none.*

[DEFENSE COUNSEL]: Objection, Your Honor, it is describing dishonest motives to counsel.

Your Honor, it is a personal attack on the defendant's counsel.

THE COURT: Overruled. It's argument.

[PROSECUTOR]: Ladies and gentlemen, *what the defense counsel has tried to do is manufacture reasonable doubt where there is none.*

In fact, we have two defenses. And I am going to try to go through this with you.

Mistake of fact and necessity are courses in law school that may take the whole year to figure out. And I've got about fifteen minutes to see if I can try to explain it.

. . . .

*The defense attorneys have attempted, as I said, to create a reasonable doubt from things they cannot get around. And let me tell you what those are.*

. . . .

Ladies and gentlemen, I think the evidence will show or the evidence does show that this man, Mr. Tilbury, brutally and savagely murdered two dogs, and that the defense is trying to give him an out. They want to say on the one hand, 'I thought they were wild dogs when I shot them. And if you won't buy that, let me try to sell you something else.'

*And what they're trying to sell you is necessity. But, ladies and gentlemen, I know because you have been paying attention and because they didn't put one over on you, you're able to see through it, see the smoke and mirrors, through the magic show.*

[DEFENSE COUNSEL]: Your Honor, the prosecutor again is striking over the shoulders of defense counsel. That's improper argument.

THE COURT: Overruled.

[PROSECUTOR]: *You are able to see through it. Once all the smoke and magic goes away,* ladies and gentlemen, you will see the defendant is guilty of the charge of cruelty to animals. And we ask that you return a verdict of guilty as charged. [Emphasis added.]

■ Tilbury argues the State was accusing his attorneys of fraud and attacking him by the accusations in the underlined parts of the argument set out above. The State argues Tilbury waived his complaints by failing to object to the portions of the argument italicized above. However, except for the second italicized part, we note that each of these

arguments were virtually identical to the argument the State had just made. The trial court overruled Tilbury's objections so the State took that opportunity to reiterate its argument. Tilbury's counsel can hardly be faulted for not wanting to anger the trial court by making the same objection to the same argument the trial court had just previously overruled. Also the middle italicized argument, taken in context, merely introduces the prosecutor's discussion of how the defense had tried to disprove the State's evidence.

In the State's closing argument, it was mainly arguing that Tilbury had changed his story between the time he talked to Deputy Morgan and the time he came to court. Although the "muddy the waters" argument was improper, we hold the trial court cured any error with its instruction to disregard the last statement. In the other arguments, taken in context, the prosecutor compares the version of the events Tilbury told the Sheriff's deputy with the version he told in court demonstrating the inconsistencies and the inconsistent defenses. The argument did not accuse the defense attorneys of manufacturing *evidence*, rather it accused them of manufacturing a *reasonable doubt*. Although the argument implies Tilbury was dishonest, it does not accuse the attorneys of knowing that Tilbury was lying nor that the attorneys encouraged him to lie.

As we view the argument in light of the evidence, it shows that when Tilbury originally talked to the deputy, not knowing he had committed a crime, he did not give legally cognizable excuses to the deputy. However, after Tilbury learned it was a crime and what defenses were plausible, he tailored his story to fit not only one but two defenses. Under these circumstances, we cannot say the trial court abused its discretion in overruling the defense objections to the argument. We overrule the third point of error.

The judgment of the trial court is affirmed.