**Affirmed and Memorandum Opinion filed March 5, 2024.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-22-00549-CV

### GLYNN WALKER AND MELINDA DEA WALKER, Appellants

### V.

### WILLIAM RALPH LAYNE WALKER A/K/A LAYNE WALKER, CYNTHIA WALKER, AND WALTLEY RENTALS, LLC, Appellees

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 15-CV-0354-A**

## MEMORANDUM OPINION

Appellants Glynn and Melinda Walker filed this action regarding ownership of a beach property in Port Bolivar, Texas. Glynn and Melinda allege that Glynn's father, Ronald Walker, now deceased, orally gave or promised Glynn ownership of the property on which Glynn and Melinda built a beach house, but then, after a family dispute arose, wrongfully conveyed the property and beach house to Glynn's brother, appellee Layne Walker, who subsequently sold it to appellee

Waltley Rentals, LLC. Glynn and Melinda have brought several claims in their lawsuit, including unjust enrichment and good faith improvements, and they have sought relief that includes restitution of ownership rights in the property. Appellees have raised several defenses, including the equitable defense of unclean hands.

This is the third appeal in this case. In our first opinion, we affirmed in part, and reversed and remanded in part, the trial court's grant of summary judgment favoring Ronald and Layne. *Walker v. Walker*, No. 14-16-00357-CV, 2017 WL 1181359, at *13 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, no pet.) (mem. op.). In our second opinion, we reversed and remanded another grant of summary judgment favoring Ronald and Layne. *Walker v. Walker*, 631 S.W.3d 259, 269 (Tex. App.—Houston [14th Dist.] 2020, no pet.). The present appeal comes to us after a jury trial and final judgment favoring appellees on all remaining claims.[1]

In four issues, Glynn and Melinda contend that (1) the jury's finding of unclean hands was unsupported by legally or factually sufficient evidence; (2) the jury's negative answer on the good faith improvements question was against the great weight and preponderance of the evidence; (3) the jury's failure to find that Glynn and Melinda were entitled to restitution was against the great weight and preponderance of the evidence; and (4) appellees' counsel made improper and incurable closing arguments to the jury. Finding no error, we affirm the trial court's judgment.

### *Background*

In July 2013, Ronald bought several tracts of land near the beach in Port Bolivar with the idea that his sons, Glynn and Layne, would build beach houses on

---

[1] Ronald passed away during the course of this litigation and neither he nor his estate is a party to this appeal. Although Layne's wife, Cynthia, participated in the trial below and is listed on appellees' brief, Glynn and Melinda do not raise any issues in regard to Cynthia.

the tracts. Each brother did so, with Ronald providing them over $100,000 a piece toward construction costs. Glynn asserted that he additionally took out a home equity loan secured by his existing home to help pay for construction. It is undisputed that during and after construction, legal title for the property on which Glynn was constructing a beach house remained with Ronald. Glynn alleged, however, that Ronald made representations that the property belonged to or would belong to Glynn and title was only being kept in Ronald's name because there was an ongoing suit to quiet title involving the property and a third party. Ronald insisted, however, that he never intended to gift the properties to Glynn and Layne but instead intended to leave the properties to them in his will.

In March 2015, after construction was completed, a family dispute arose with Glynn and Melinda on one side and Ronald and Layne on the other. As a result of this dispute, Glynn and Melinda moved their belongings out of the beach house that Glynn had constructed and Ronald conveyed the entirety of the property to Layne.

Glynn and Melinda filed suit, alleging that they owned equitable title to two of the lots that Ronald conveyed to Layne through an oral parol gift from Ronald. They also asserted a theory of promissory estoppel against Ronald and theories of unjust enrichment and breach of fiduciary duty against Layne. Over the course of the litigation, Ronald died and was replaced by his estate in the proceedings and Layne sold the property to Waltley Rentals, who was then named as a defendant by Glynn and Melinda. At trial, Glynn and Melinda did not pursue their promissory estoppel claim against Ronald's estate but pursued equitable claims for unjust enrichment and good faith improvements and sought restitution of ownership in the

property.[2] Appellees continued to assert their unclean hands defense.

The jury charge consisted of six questions and related instructions. In response to Question 1, the jury found that Glynn and Melinda had "unclean hands" in regard to ownership of the property. Language in the charge following Question 1, but before Question 2, instructed the jury: "[i]f you answered "No" to Question No. 1, then answer the following questions. Otherwise, do not answer the following questions." The jury therefore did not answer Question 2, regarding unjust enrichment, or Question 3, regarding unjust enrichment damages. The jury, however, answered Question 4, concerning good faith improvements to the property.[3] In response to Question 4, the jury found Glynn and Melinda did not make improvements in the good faith belief that they owned the property. Question 5 inquired about the value of the improvements and was conditioned on a positive answer to Question 4, so the jury did not answer Question 5. Question 6 asked whether Glynn and Melinda should receive legal title to the property in restitution, to which the jury responded "no."

In accordance with the jury verdict, the trial court entered judgment favoring appellees on all claims against them. The trial court further dismissed any remaining claims against Ronald's estate based on the fact that Glynn and Melinda elected only to pursue claims against appellees Layne, Cynthia, and Waltley.

We will begin by addressing Glynn and Melinda's claims against Layne before turning to Waltley's role in this appeal. Lastly, we will examine Glynn and

---

[2] The trial court noted in the judgment that Ronald's estate had not been properly served and that Glynn and Melinda chose to proceed only against the other defendants.

[3] Although we decline to speculate as to why the jury answered Question 4 despite the instruction after Question 1 stating to not answer the questions that followed, we do note that the charge included the following instruction before Question 3: "If you answered "Yes" to Question No. 2, then answer the following question. Otherwise, do not answer the following question, but go on to Question No. 4."

Melinda's contentions regarding closing argument. As stated, Glynn and Melinda do not raise any issues concerning Cynthia.

### *Claims Against Layne*

In their first issue, Glynn and Melinda challenge the sufficiency of the evidence to support the jury's "yes" answer to Question 1, which asked whether Glynn and Melinda had unclean hands in regard to ownership of the property. Specifically, regarding Layne, Glynn and Melinda contend that there was no evidence that he suffered serious harm due to Glynn or Melinda's conduct, or, alternatively, that the jury's answer was against the great weight and preponderance of the evidence because the evidence established Layne was not harmed but instead received a windfall.

The equitable doctrine of unclean hands may be applied only to one whose own conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing. *E.g.*, *In re Jim Walter Homes, Inc.*, 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The complaining party must also show that they were seriously harmed by the alleged conduct and that the wrong complained of cannot be corrected without applying the doctrine. *Id.*

Question 1 asked:

> Did Glynn Walker and Melinda Walker have "unclean hands" with regard to the alleged ownership of the property located at 1508 Galveston Avenue, Port Bolivar, Texas 77650?
>
> "Unclean Hands" means one whose conduct in connection with the same matter or transaction has been unconscientious, unjust, or marked by a want of good faith, or one who has violated the principles of equity and righteous dealing.

5

The jury answered the question "yes."

As can readily be seen, the jury charge omitted the very element of the unclean hands defense that Glynn and Melinda challenge, i.e., that the complaining party must demonstrate serious harm. Pursuant to Texas Rule of Civil Procedure 279, when an incomplete ground of recovery or defense is submitted without complaint, the parties are deemed to have waived a jury trial on any omitted elements and to have agreed to submit any such elements to the trial court. Tex. R. Civ. P. 279; *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002); *Clouse v. Levin*, 339 S.W.3d 766, 770 (Tex. App.—Houston [14th Dist.] 2011, no pet.). The trial court may then make written findings on the omitted elements at a party's request, but when, as here, the court does not make such findings, the omitted elements are deemed found by the court in a manner supporting the judgment if the deemed findings are supported by some evidence. *In re J.F.C.*, 96 S.W.3d 256, 262–63 (Tex. 2002); *Clouse*, 339 S.W.3d at 770. We interpret Glynn and Melinda's first issue as challenging the sufficiency of the evidence to support the deemed finding on serious harm. *See In re J.F.C.*, 96 S.W.3d at 273 ("an appellate court will review . . . challenges to the legal and factual sufficiency of the evidence supporting the omitted finding").

In their brief, Glynn and Melinda describe their relevant conduct as simply building a beach house that is valued at more than the amount of money Ronald expended for the project. They then suggest that Layne's only assertions of harm were based on his perception that Glynn had betrayed the family and showed a lack of gratitude regarding the beach house project. They argue, without citation to authority or analysis, that these supposed feelings did not constitute harm for purposes of establishing an unclean hands defense. They emphasize that Glynn put time, money, and effort in building a beach house that was then given to Layne and

which Layne subsequently sold at a profit, thus receiving a windfall. They further argue that any allegation Glynn misappropriated funds on the project was not supported by the evidence.

In their brief, appellees contend that Glynn and Melinda are wrong to simply view the question of harm in terms of a financial balance sheet, i.e., that so long as Layne was unjustly enriched by receiving the property there could ultimately be no serious harm to him. Appellees then point to Layne's testimony at trial where he discussed the expenses, difficulties, emotional stress, and damages caused by Glynn and Melinda's conduct regarding the beach house project. Layne explained that when Glynn and Melinda abandoned the beach house, Layne incurred tens of thousands of dollars in finishing, repairing, and replacing things at the house, including replacing removed appliances as well as damaged flooring and windows, and conducting sheetrock repairs and painting and caulking under the house. The sheetrock was allegedly damaged when Glynn ripped down LED lighting near the ceiling and because two-by-fours had been nailed to the wall as bedframes. Layne recounted additional bills he was required to pay on the second beach house, including utilities, taxes, and insurance, and he insisted he had not wanted the obligations and responsibilities of owning a second beach house.

Layne further explained that Glynn's conduct in abandoning the property and making "vicious" allegations against Ronald and Layne had ruined any enjoyment in what they had been trying to accomplish with the family compound by the beach. He suggested that instead of being a place to relax and feel good on visits, the very sight of the two houses began to immediately cause him "nothing but anxiety" and the houses became a place they never wanted to visit. He complained of mental anguish and damage to his reputation due to Glynn's defamatory allegations relating to the project. He spoke of anxiety and the loss of

family relationships caused by Glynn's "vicious" behavior. Cynthia, Layne's wife, also testified that the family had been "splintered."

Layne further said that beyond Ronald's prohibition on renting, he also did not want to rent out the second house because they did not want their beach home next to a rental house occupied by strangers. According to Layne, Ronald stopped going to the beach compound because he could not take it emotionally, and the dream Layne had of passing his beach house down to his "future grandkids" was ruined. Layne stated that he finally sold both homes and took a loss on the sale of the house that he had built. Lastly, he noted that his legal bills due to the dispute Glynn caused were in excess of any amount Glynn had invested in building the beach house.

Glynn and Melinda do not address any of these reported harms allegedly caused by their conduct despite the fact that appellees list them in their brief with supportive record citations. We find no support in the caselaw for Glynn and Melinda's suggestion that Layne could not have suffered serious harm because he ultimately came out ahead financially. To the contrary, the unclean hands analysis is typically part of a weighing or balancing of equities and not simply a determination of whether a defendant ultimately gained financially. *See, e.g.*, *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841 (5th Cir. 2004) (explaining that Texas courts often speak in terms of weighing or balancing the equities when determining whether the doctrine of unclean hands was correctly applied in a case); *see also Sister Initiative, LLC v. Broughton Maint. Ass'n*, No. 02-19-00102-CV, 2020 WL 726785, at *29–30 (Tex. App.—Fort Worth Feb. 13, 2020, pet. denied) (affirming trial court's rejection of equitable claim where evidence supported finding that party asserting claim had unclean hands despite the fact opposing party may have received a windfall). We decline to make Glynn and

Melinda's argument for them regarding whether Layne's testimony constituted sufficient evidence of serious harm. *See Sister Initiative*, 2020 WL 726785, at *29 ("It is not our job to make arguments for the parties.").

Because the trial court's deemed finding regarding serious harm as to Layne was supported by evidence and Glynn and Melinda do not challenge the unclean hands determination on any other basis, we overrule Glynn and Melinda's first issue to the extent that it challenged this deemed finding. *See In re J.F.C.*, 96 S.W.3d at 262–63, 273.

As Glynn and Melinda appear to recognize, equitable claims are subject to equitable defenses, such as unclean hands, and a trial court can refuse to grant equitable relief upon a finding the party requesting such relief had unclean hands. *See Kroesche v. Wassar Logistics Holdings, LLC*, No. 01-20-00047-CV, 2023 WL 1112002, at *25 (Tex. App.—Houston [1st Dist.] 2023, pet. denied); *Stewart Beach Condo. Homeowners Ass'n v. Gili N Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App—Houston [1st Dist.] 2015, no pet.). Under their second and third issues—respectively challenging the jury's failure to find either that they made good faith improvements or were entitled to restitution—Glynn and Melinda do not suggest that their remaining claims survive against a finding of unclean hands. Accordingly, we overrule these issues to the extent that they challenge the portion of the judgment favoring Layne.

### *Claims Involving Waltley*

In regard to Waltley, Glynn and Melinda argue that (1) there was no evidence that it was seriously harmed by their conduct, thus, they did not have unclean hands with respect to Waltley; (2) the jury's negative answer on the good faith improvements question was against the great weight and preponderance of the evidence; and (3) the jury's failure to find that Glynn and Melinda were entitled to

9

restitution of their rights in the property was against the great weight and preponderance of the evidence. The question of whether Waltley was seriously harmed by Glynn and Melinda's conduct is a closer issue than whether Layne was seriously harmed. But, even if we were to conclude that Waltley was not seriously harmed, we would not reverse the take-nothing judgment favoring Waltley because Glynn and Melinda have not established that the jury's findings on good faith improvements and restitution were against the great weight and preponderance of the evidence.

As stated, in their second issue, Glynn and Melinda challenge the factual sufficiency of the evidence to support the jury's determination in response to Question 4 that Glynn and Melinda did not make improvements to the property in the good faith belief that they were the true owners of the property, i.e., that they had good title to the property. *See generally Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 425 (Tex. 2008) ("The principle is well established in equity that a person who in good faith makes improvements upon property owned by another is entitled to compensation therefor.") (quoting *Sharp v. Stacy*, 535 S.W.2d 345, 351 (Tex. 1976), and citing *Resol. Tr. Corp. v. Kemp*, 951 F.2d 657, 665 (5th Cir. 1992) ("Under Texas law, a purchaser who makes improvements upon property in the good faith belief that it has good title to the property is entitled to compensation for the improvements.")).[4]

---

[4] Question 4 reads as follows:

Did Glynn Walker and Melinda Walker make improvements to the property located at 1508 Galveston Avenue, Port Bolivar, Texas 77650 in the good faith belief that they were the true owners of the property?

Answer "Yes" or "No."

Under Texas law, one who makes improvements upon property in the good faith belief that he has good title to the property is entitled to

In support of this assertion, Glynn and Melinda lean heavily on Glynn's testimony that Ronald was to transfer the deeds to the tracts of land to Glynn whenever Glynn was ready after construction was completed and the quiet title lawsuit was resolved. Contrary to Glynn and Melinda's assertions, however, this testimony appears to confirm that Glynn knew he did not have legal title to the property at the time he constructed the beach house. Moreover, to the extent Glynn and Melinda rely on this testimony to establish some form of equitable title, that was not the theory submitted to the jury in Question 4, and, regardless, the jury was free, as the sole judge of witness credibility, to reject Glynn's testimony. *See, e.g.*, *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). In his videotaped testimony, Ronald insisted that he always intended that the property would be his homestead until he died and that Glynn had a copy of Ronald's will providing for transfer of the property upon Ronald's death. The jury could have reasonably concluded from Glynn and Ronald's testimony that Glynn and Melinda did not make improvements to the property in the good faith belief that they were the true owners of the property, i.e., that they had good title to the property.[5]

compensation for the improvements.

> The one making the improvements must show that the improvements were made without actual or constructive notice of another party's superior rights in the property. Even constructive knowledge of superior claims destroys a claim for improvements under the "good faith improver" theory.

> For one to qualify as a "good faith improver" under the rule of betterments he must show not only that he believed that he was the true owner of the land but also that he had reasonable grounds for that belief.[]

> The "rule of betterments" or "good faith improver" theory includes a requirement that the one making the improvements must have examined the records to be in good faith.

As stated, the jury answered Question 4 "no."

[5] We additionally note that Glynn and Melinda spend a significant portion of their

11

Accordingly, we overrule Glynn and Melinda's second issue.

In their third issue, Glynn and Melinda challenge the factual sufficiency of the evidence to support the jury's finding in response to Question 6 that Glynn and Melinda were not entitled to the equitable remedy of restitution of their rights in the property. This issue is rendered moot by the fact that Glynn and Melinda were not successful in establishing any underlying equitable claim for which restitution would be a proper remedy. Accordingly, we overrule their third issue.

### *Closing Argument*

In their fourth issue, Glynn and Melinda contend that appellees' counsel made improper and incurable closing arguments to the jury. Trial counsel is entitled to wide latitude in arguing the evidence, and reasonable inferences from the evidence, to the jury. *Wellons v. Valero Ref.-New Orleans, L.L.C.*, 616 S.W.3d 220, 231 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Control over counsel during closing argument is within the trial court's sound discretion and should not be disturbed absent clear abuse of that discretion. *Id*. If the probable harm from an improper jury argument is curable, then the error must be preserved by obtaining an adverse ruling on a timely objection, motion to instruct the jury, or motion for mistrial. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam). Only when argument is deemed so prejudicial and inflammatory that its impact would not be curable by an instruction to disregard is no objection necessary. *Wellons*, 616 S.W.3d at 231. And even then, the complaint at least must be raised in a motion for new trial, as appellants did here. *See Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009).

---

argument under the second issue discussing the elements of a basic unjust enrichment claim, but they only pursued such a claim against Layne and not against Waltley. These arguments therefore have no bearing on our analysis of the good faith improvements claim as it relates to Waltley.

In order to show that Layne's and Waltley's counsel made incurable arguments, Glynn and Melinda must prove: (1) an improper argument was made; (2) it was not invited or provoked; (3) it was not curable by a prompt withdrawal of the statement by counsel or a reprimand or instruction by the trial court; and (4) by its nature, degree, and extent, the argument constituted harmful error based on an examination of the entire record to determine the argument's probable effect on a material finding. *Wellons*, 616 S.W.3d at 231. The duration of the argument, whether it was repeated or abandoned, and whether there was cumulative error are factors for consideration. *Id.* Glynn and Melinda must also show that the probability the improper argument caused harm is greater than the probability the verdict was grounded on proper proceedings and evidence. *Id.* Instances of truly incurable jury argument are rare. *Phillips*, 288 S.W.3d at 883. Glynn and Melinda must demonstrate that "the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id.* (quoting *Goforth v. Alvey*, 153 Tex. 449, 271 S.W.2d 404, 404 (1954)).

Glynn and Melinda first contend that Layne's counsel accused their counsel of suborning perjury based on three different arguments. They then allege that Layne's counsel argued outside the record and that Waltley's counsel engaged in improper bolstering of a witness and an oversimplification of the issues in the case. Glynn and Melinda did not object to any of these arguments at trial. We will begin with the suborning perjury allegations before moving on to the other arguments.

While the Texas Supreme Court and this court have never addressed the issue, the Court of Criminal Appeals has concluded that accusing counsel of suborning perjury can be incurable argument in a criminal trial. *See Gomez v. State*, 704 S.W.2d 770, 772–73 (Tex. Crim. App. 1985). However, we need not

13

address the issue in this case because the arguments here did not rise to the level of accusing counsel of suborning perjury.

To suborn perjury means to act with the intent to promote or assist a witness in providing false testimony. *See Rodriguez v. MumboJumbo, L.L.C.*, 347 S.W.3d 924, 927 (Tex. App.—Dallas 2011, no pet.); *Hardy v. State*, 246 S.W.3d 290, 296 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Glynn and Melinda first assert that Layne's counsel accused their counsel of suborning perjury by being critical of the order in which their counsel called witnesses. Nothing about this argument rises to the level of suborning perjury; instead, it appears that Layne's counsel was trying to argue that Glynn's counsel made the case unnecessarily confusing by his order of witnesses. This is not an allegation of suborning perjury, as it contains no claim that any witness testified falsely.

A closer call is Layne's counsel's argument about why Glynn was called last in the case:

> [T]he last witness, of course, is Glynn. Why did he come last? That was purposeful. Glynn got to sit there and tell you—he got to sit and watch everything transpire before he got to take the stand. And I'm saying it's purposeful, because he got to change his testimony in a form it was presented.

> I'll give you an example. Thursday evening he testified about the amount of money that he contributed to the home: I have no idea[]. It would be a pure guess and speculation. Friday morning he comes up with a straight figure. This was it. Very next day changes his testimony, and it wasn't on cross. Why? Oh, I computed it two days ago. Remember that? Two days ago I made that calculation.

This argument, however, was permissible because counsel followed up his statement with a factual rendition of how Glynn was able to adjust his testimony; the argument did not accuse Glynn's counsel of knowingly promoting false testimony. *See Magna v. State*, 177 S.W.3d 670, 675 (Tex. App.—Houston [1st

14

Dist.] 2005, no pet.); *Tilbury v. State*, 890 S.W.2d 219, 223–24 (Tex. App.—Fort Worth 1994, no pet.).

Glynn and Melinda also assert that the following argument was an accusation of suborning perjury:

> I'll give you one other example. Remember when Melinda was on the stand, she was asked questions by her attorney and she couldn't remember what the answer was supposed to be. And [her attorney] said: Don't you remember what we talked about? Don't you remember what we talked about?

We disagree. This was not an accusation of suborning perjury; it was simply a factual recitation of how a witness had to be reminded of her previous deposition testimony—a permissible argument.

Next, Glynn and Melinda accuse Layne's counsel of arguing outside the record and stating that Glynn and Melinda's son, Ky, had been "shacked up with his whore." This, however, appears to be a misunderstanding as to what Layne's counsel was referring. During her testimony, Cynthia recounted a conversation that she allegedly had with Melinda in which Melinda stated that Ronald had at one-time been "shacked up with his whore."[6] In his closing remarks, it is clear that Layne's counsel was recalling that testimony and not suggesting that Ky had been engaging in such conduct.

Regarding Waltley's counsel's closing argument, Glynn and Melinda first assert that he engaged in improper bolstering of Ronald's videotaped testimony. In the cited portion of his argument, counsel recounted a personal kindness that Ronald had shown him when counsel was a child, and counsel listed the judgeships to which Ronald had been elected in his lifetime. Secondly, Glynn and Melinda complain that Waltley's counsel reduced the entire case to Glynn having assumed

---

[6] In context, the phrase appears to refer simply to unmarried people living together.

15

the risk when he built a beach house on property that he did not own.

We begin our analysis by noting that while Glynn and Melinda cite to boilerplate law on incurable jury argument, they do not offer any citations to authority addressing similar assertions of incurable argument as they raise here. Additionally, apart from generic statements that the arguments were improper or suborned perjury, Glynn and Melinda do not provide specific analysis as to why these statements by counsel constituted incurable argument. Although some of the highlighted statements could be considered improper—we specifically note here Waltley's counsel's recounting of a decades-old, personal kindness done to him by Ronald—we are unconvinced that any improper argument could not have been resolved by prompt withdrawal of the statement by counsel or a reprimand or instruction by the trial court. *See Wellons*, 616 S.W.3d at 231. Ultimately, Glynn and Melinda have failed to demonstrate that "the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883. Considering the record as a whole, we conclude that the probability the allegedly improper jury argument caused harm is not greater than the probability that the verdict was grounded on proper proceedings and evidence. *See Wellons*, 616 S.W.3d at 231, 233. Accordingly, we overrule the fourth issue.

16

***Conclusion***

Having overruled all of Glynn and Melinda's issues, we affirm the trial court's judgment.

/s/      Frances Bourliot
Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Zimmerer.