**Opinion issued November 5, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-23-00262-CR

_____

### CASSANDRA YVETTE GARCIA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 175917901010**

---

## MEMORANDUM OPINION

A jury convicted Cassandra Yvette Garcia of delivery of a controlled substance in penalty group one—cocaine weighing more than one gram and less than four grams.[1] The trial court sentenced her to ten years' confinement but suspended

---

[1] *See* TEX. HEALTH & SAFETY CODE § 481.112(a), (c).

the sentence and placed her on two years' community supervision. On appeal, Garcia argues: (1) the jury could not have rejected her entrapment defense; (2) the State made improper jury arguments and willfully violated a motion in limine; and (3) the cumulative effect of the prosecutor's misconduct denied her a fair trial.

We affirm.

## Background

Garcia was charged with delivery of a controlled substance in connection with an undercover operation that began at a bar in downtown Houston. Garcia was alone at the bar when undercover officer S. Wakefield started a conversation. Wakefield introduced Garcia to another undercover officer, C. Goodrich, and told Garcia that Goodrich needed a confidence boost after breaking up with his girlfriend. Garcia believed Wakefield was trying to set her up with Goodrich.

Garcia talked with Wakefield and Goodrich for some time before Wakefield excused herself from the conversation, leaving Goodrich and Garcia alone. According to Garcia, she and talked to Goodrich for about two hours, during which Goodrich flirted with her, put his arm around her, and placed his hand on her thigh once. But Goodrich did not remember any touching. And Wakefield saw none.

Goodrich told Garcia that he was a construction worker from Beaumont, Texas and needed some "party favors" to stay awake for the long ride home. Garcia suggested coffee shops nearby, but Goodrich insisted on something stronger.

2

According to Goodrich, Garcia then "tapped her nose and said that she had some coke in her purse." Goodrich understood Garcia's reference to "coke" to mean cocaine. And she handed him a baggie containing a "white powdery substance."

Goodrich offered Garcia $40 for the baggie. Whether she accepted the cash was disputed at trial. Garcia testified that she refused the money because she gave Goodrich a "residue bag" that contained an "extremely small" amount of "coke." She claimed that she gave the money to the bartenders as a tip. Shortly after, Wakefield returned to the conversation, and Goodrich showed her the baggie containing the white powdery substance. Wakefield testified that Garcia knew of this interaction and acted naturally about it.

Before leaving the bar, Garcia and Goodrich exchanged phone numbers. Garcia said they also hugged, but Goodrich denied that. Later that night, they exchanged text messages. Garcia thanked Goodrich for "tossing [her] some cash" and asked if Goodrich wanted her to "snag" him something from her "guy," considering not much was left in the baggie she had given him. Goodrich responded that the baggie was "plenty for now" and that he "owe[d]" her. Garcia asked, "What do you have in mind?" Goodrich said that he could "think of a few things" but did not want to "make her blush." He then said that he was "passing out," had to "wake up in[] 3 hours," and "hope[d] to talk soon." Garcia responded that she would be

"waiting." She believed that the next time she saw Goodrich, the two of them would "probably hook up."

Goodrich and Garcia texted again about three weeks later. Goodrich asked Garcia to meet him and some friends for drinks at another bar. He asked Garcia if she "could bring out some of that good [she] had last time too?" Garcia responded, "Definitely. How much are you thinking?" Goodrich said an "8ball would do." Garcia said she needed to "double check with [her] guy." She explained at trial that she did not know how much an "8ball" would cost because she had never bought in that quantity before.

Goodrich and Garcia talked on the phone after texting. Over the phone, Garcia told Goodrich that what he asked for would cost $240. Later, Garcia texted Goodrich that her dealer had the "goods" he requested, and she would meet him. Garcia testified that she drove to pick up the cocaine from her dealer because, even though she had never done something like that before, she believed that, if she delivered the cocaine to Goodrich, he would have sex with her that night. And that was something she wanted.

To prepare for the buy, Goodrich photographed the serial numbers of the prerecorded buy money issued to him by the City of Houston. He and a group of undercover officers were already at the bar when Garcia arrived. She met them on the patio, and Goodrich introduced her to the group. Immediately after, Garcia

4

passed the cocaine to Goodrich under the table, and Goodrich gave her $240 of prerecorded money. Garcia testified that Goodrich said he had a hotel room and wanted her to stay the night. They stayed at the bar for about 40 minutes when Goodrich asked Garcia to change locations and meet him at a different bar. Garcia believed Goodrich was inviting her to a "cocaine and sex party" at the hotel.

A takedown unit was waiting outside the bar. As Garcia followed Goodrich in her car, the takedown unit did a traffic stop, detained Garcia, and found the prerecorded money in her car. One officer confirmed the money matched the prerecorded bills. A detective received and tagged the bag of cocaine from Goodrich. And a forensic analyst confirmed the substance was 3.4 grams of cocaine.

Garcia asserted entrapment as a defense. She claimed that Goodrich persuaded her to commit the offense by convincing her that he wanted to have sex with her. She had interpreted Goodrich's text messages as implying feelings that he owed her something more personal, like a physical relationship. She found Goodrich attractive and their interaction and text messages flirtatious. She acknowledged that she was "exceptionally vulnerable to men" because of previous bad relationships. And that she was looking to make someone happy. She felt like Goodrich deceived her into giving him cocaine by pretending to like her.

For his part, Goodrich acknowledged that his text exchanges with Garcia were flirtatious and that a reasonable person might think he was interested in a

5

relationship. But he defended his actions as appropriate in his undercover role, which required him to act in ways he normally would not as a uniformed officer.

The jury ultimately rejected Garcia's entrapment defense and returned a guilty verdict. Garcia appealed.

**Sufficiency of the Evidence**

In her first issue, Garcia contends that the evidence is legally insufficient to support the jury's rejection of her entrapment defense.

## I.    Standard of review and applicable law

"Some types of criminal conduct, such as the illicit drug trade, present difficult issues of detection and prosecution because the crime is committed secretly between willing participants." *Hernandez v. State*, 161 S.W.3d 491, 497 (Tex. Crim. App. 2005). Thus, "law enforcement officers sometimes resort to 'encouragement' or 'undercover sting operations' to bring these crimes to light." *Id.* But extreme forms of law enforcement "encouragement" can induce an otherwise law-abiding person to engage in criminal conduct that she would not otherwise have committed. *Id.* The defense of entrapment recognizes the "competing goals of promoting effective law enforcement by permitting undercover operations and preventing inappropriate and coercive trickery, persuasion, or fraud by law enforcement officials." *Id.*

It is a defense to prosecution that the defendant engaged in the charged conduct "because [s]he was induced to do so by a law enforcement agent using

persuasion or other means likely to cause persons to commit the offense." TEX. PENAL CODE § 8.06(a). Conduct merely giving a person a chance to commit a crime is not entrapment. TEX. PENAL CODE § 8.06(a); *Rodriguez v. State*, 662 S.W.2d 352, 355 (Tex. Crim. App. 1984). The criminal intent must originate in the law enforcement agent's mind, and the agent must induce the defendant to commit the offense. *Torres v. State*, 980 S.W.2d 873, 875 (Tex. App.—San Antonio 1998, no pet.).

Entrapment includes subjective and objective elements. *England v. State*, 887 S.W.2d 902, 913 (Tex. Crim. App. 1994). The subjective element requires evidence that the persuasiveness of the police conduct induced the defendant to commit the charged offense. *Id.* at 913 n.10. The objective element requires evidence that the persuasion was such that it would cause an ordinarily law-abiding person of average resistance to commit the offense. *Id.* at 914. For the objective element, prohibited police conduct can include pleas based on extreme need, sympathy, pity, or close friendship; offers of inordinate sums of money; and other methods of persuasion that are likely to cause the otherwise unwilling person—not the ready, willing, and anxious person—to commit a crime. *Hernandez*, 161 S.W.3d at 497 n.11; *Ramos v. State*, 632 S.W.2d 688, 691 (Tex. App.—Amarillo 1982, no pet.). The amount of persuasion used to induce an ordinary law-abiding person of average resistance will depend on the particular facts of each case. *Roberts v. State*, No. 01-09-00561, 2010

7

WL 3934598, at *1 (Tex. App.—Houston [1st Dist.] Oct. 7, 2010, no pet.) (mem. op., not designated for publication).

The defendant has the initial burden of producing a prima facie case of entrapment. *Hernandez*, 161 S.W.3d at 497. Once evidence is produced, the burden shifts to the State to disprove the defense beyond a reasonable doubt. *Id.* at 498. This burden of persuasion does not require the State to produce evidence to refute entrapment; it requires only that the State prove its case beyond a reasonable doubt. *See id.* (stating that in burden-shifting context, entrapment behaves like self-defense); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Entrapment typically is a jury issue because its resolution depends mainly on credibility assessments. *See Hernandez*, 161 S.W.3d at 499 (noting that entrapment issues are appropriate for jury resolution "because the jury has a 'particular claim to competence' on the question of what temptations would be too great for an ordinary law-abiding citizen").

The jury is the sole judge of the weight and credibility of the evidence. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The jury is free to accept or reject all or any portion of a witness's testimony. *Hernandez*, 161 S.W.3d at 500. A jury's guilty verdict is an implicit finding rejecting the defense. *Saxton*, 804 S.W.2d at 914. In reviewing a jury's rejection of an entrapment defense, we examine the evidence in the light most favorable to the verdict to determine whether a rational

8

jury could find the elements of the offense beyond a reasonable doubt and find against the defendant on entrapment beyond a reasonable doubt. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (citations omitted).

## II. The jury could reject Garcia's entrapment defense

The jury found Garcia guilty of delivering a controlled substance in penalty group one—cocaine—weighing more than one gram and less than four grams. *See* TEX. HEALTH & SAFETY CODE §§ 481.102(3)(D), .112(a), (c). Garcia admitted during trial that she committed an offense by delivering an "8ball" to Goodrich. The State's testing confirmed that the substance Garcia gave Goodrich was cocaine weighing 3.40 grams. Considering the evidence in the appropriate light, we conclude the jury could reasonably have found that neither the subjective nor the objective element of entrapment was satisfied. *See England*, 887 S.W.2d at 913.

Garcia claimed that she was induced to commit the offense by Goodrich's attractiveness and flirtatious conduct. She explained—and Goodrich agreed—that their initial conversation and subsequent text messages were flirtatious. According to Garcia, Goodrich had put his arm around her, touched her thigh, and hugged her. So when he texted that he "owed her" after their first meeting, she believed he was hinting at a sexual relationship. And when he invited her out to have drinks a few weeks later, she believed they would have sex that night. She viewed getting Goodrich the cocaine he asked for as a prerequisite for having sex with him, which

9

was something she wanted. She testified that she was not in the business of selling narcotics and had never done something like this before. In other words, she claimed that Goodrich's attractiveness and flirtatious conduct created in her such a strong desire that she was induced to distribute cocaine.

Even if Garcia's testimony were some evidence that Goodrich persuaded her to commit the offense that could satisfy the subjective entrapment element, the jury did not have to believe her. *See Hernandez*, 161 S.W.3d at 500. Garcia had cocaine in her purse when she met Goodrich and gave him the residue bag in their first meeting. Garcia had no previous relationship with Goodrich and had known him only a few hours. In the text messages exchanged that same evening, she made an unprompted offer to get Goodrich more cocaine. The jury reasonably could conclude that Goodrich's conduct merely gave Garcia the chance to commit a crime, but that she did so of her own volition. *See Ramos*, 632 S.W.2d at 691 (where defendant had provided undercover officer with drugs before, officer's subsequent request for drugs was not entrapment but merely affording defendant opportunity to commit crime).

Additionally, the jury reasonably could have credited evidence that Goodrich's persuasion tactics would not have caused an ordinarily law-abiding person of average resistance to commit the offense. *See id.*; *see also Ramos*, 632 S.W.2d at 691. Garcia's testimony included admissions from which the jury could

10

infer that she is not a person of average resistance. For instance, Garcia agreed on cross-examination that she was "exceptionally vulnerable" to men because of past trauma and often felt pressure to do things to make others happy. But as the Texas Court of Criminal Appeals has instructed,

> [t]he hallmark of a purely objective test for entrapment is the hypothetical person. . . . The question becomes whether the persuasion used by the law enforcement agent was such as to cause a hypothetical person—an ordinarily law-abiding person of average resistance—to commit the offense, not whether it was such as to cause the accused [her]self, given [her] proclivities, to commit it.

*England*, 887 S.W.2d at 908. The jury could reasonably find that Goodrich's flirtations—in a single in-person conversation, some text messages, and a phone call—would not induce an ordinarily law-abiding person of average resistance to give a controlled substance to someone she desired but had known only a short time. *See id.*; *see also Hernandez*, 161 S.W.3d at 499.

Considering all the evidence, the jury, as the sole judge of witness credibility, could have found beyond a reasonable doubt that Garcia committed the offense (which she admitted) and could have also disbelieved her testimony that she committed the offense only because of entrapment. *See Braughton*, 569 S.W.3d at 609. We therefore hold that the evidence supports the jury's verdict, including its rejection of Garcia's entrapment defense.

We overrule Garcia's first issue.

11

## Denial of Mistrial

In her second issue, Garcia contends that the trial court should have granted a mistrial because of pervasive prosecutorial misconduct. Garcia asserts that prosecutorial misconduct occurred when the prosecutor repeatedly violated a motion in limine and then made several improper jury arguments "lambast[ing] defense counsel, solicit[ing] the jury to render a verdict on facts not in evidence, and encourag[ing] the jury to equate attractiveness . . . with entrapment." Garcia further asserts that such conduct sent a message to the jury that it could "ignore the law" and follow a "shoot-from-the-hip mentality." In cumulative effect, Garcia says, the prosecutorial misconduct denied her a fair trial.

## I.     Standard of review and applicable law

"Prosecutorial misconduct rises to a due-process violation when it is so significant that it deprives a defendant of a fair trial." *Clark v. State*, 365 S.W.3d 333, 338 (Tex. Crim. App. 2012). There is no "general test for all types of prosecutorial misconduct." *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988). Instead, courts examine such claims case-by-case, referencing three factors that "provide a starting point for identifying reversible conduct." *Id.* at 830–31. The factors are whether (1) the defendant objected to the prosecutor's conduct; (2) the prosecutor's conduct was a deliberate violation of an express court order; and (3) the conduct was "so blatant as to border on being contumacious." *Id.* at 831 (noting the

prosecutor's improper conduct "indicate[d] a desire to impermissibly sway the jury"). But these factors are neither exhaustive nor mandatory. *Id.*

A mistrial is the trial court's remedy for improper conduct so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We review the denial of a motion for mistrial for an abuse of discretion and will uphold the ruling if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). In determining whether a trial court abused its discretion by denying a mistrial, we consider: (1) the severity or prejudicial effect of the underlying conduct; (2) any curative measures adopted; and (3) the certainty of the conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 84; *Hernandez v. State*, 454 S.W.3d 643, 649 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

## II.     A mistrial was not required

Garcia did not make a specific objection to the alleged pervasive prosecutorial misconduct at trial. *See Clark v. State*, No. 09-20-00083-CR, 2021 WL 5498115, at *7 (Tex. App.—Beaumont Nov. 24, 2021, no pet.) (mem. op., not designated for publication) ("Prosecutorial misconduct is generally an independent basis for objection that must be specifically urged [at trial] in order for error to be preserved."); *Hajjar v. State*, 176 S.W.3d 554, 556 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding that appellant had not preserved complaint about

prosecutorial misconduct because he did not object on that theory at trial). Nor may we consider in our analysis any prosecutorial conduct for which Garcia did not preserve a complaint. *Compton v. State*, 666 S.W.3d 685, 731 (Tex. Crim. App. 2023) (holding that even prosecutorial misconduct that rises to the level of a due process violation may be subject to procedural default and declining to consider, either "separately or cumulatively," unchallenged instances of alleged misconduct). Thus, even if Garcia did not have to object on the specific basis of prosecutorial misconduct, if she did not otherwise preserve error about the prosecutor's actions, we will not consider those acts.[2] *See id.*

## A.  Motion in limine violations

The trial court granted a motion in limine preventing the State from introducing testimony that the undercover officers believed the substances Garcia gave Goodrich were cocaine without first approaching the bench. Garcia contends that the prosecutor violated this motion at least three times when he offered testimony from Wakefield and Goodrich that, based on their training and experience, they believed the substances were cocaine. The first time was when the prosecutor asked Wakefield whether, after she returned from the bathroom, "Goodrich showed

---

[2]     Certain types of unchallenged prosecutorial misconduct may be grounds for reversing a conviction because the defendant could not have known about the misconduct when it occurred, such as if the prosecutor knowingly used perjured testimony. *See Johnson v. State*, 169 S.W.3d 223, 229 (Tex. Crim. App. 2005). But Garcia does not allege that kind of misconduct.

[her] anything," and she responded, "Yes, he showed me a clear bag with a white powdery substance that I know to be powdered cocaine." The trial court sustained Garcia's objection to violating the motion in limine, instructed the jury to disregard Wakefield's statement, and denied a mistrial. The second time was when the prosecutor asked Goodrich whether, after Garcia told him that she had "coke," he believed based on his training and experience that what she handed him was cocaine. Garcia objected before Goodrich answered, and the trial court sustained the objection. Garcia did not ask for an instruction to disregard but moved for a mistrial, which the trial court denied. The third time was when the prosecutor asked Goodrich whether he still had "the drugs" when Garcia was traffic stopped. Garcia objected and requested a mistrial, which the trial court denied.

We find no abuse of the trial court's discretion in refusing to grant a mistrial. On the one occasion an officer testified that the substance was cocaine, the trial court instructed the jury to disregard. "Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *see Coble*, 330 S.W.3d at 292–93 (courts presume jury will follow instructions). This is not a time when it appears the elicited testimony was so clearly calculated to inflame the jurors' minds or is of such a damning character as to suggest that it would be impossible to remove the harmful impression from the jurors' minds.

15

Additionally, we cannot say that Wakefield's answer and the prosecutor's other questions were so prejudicial to make the expenditure of further time and expense wasteful and futile. In setting up the entrapment defense in his opening statement, defense counsel acknowledged that Goodrich asked Garcia to "bring some cocaine" and that she got it. And the jury heard other evidence that the substances were cocaine. Testimony that lab testing confirmed the substance was cocaine was admitted without objection. Garcia herself acknowledged that she had cocaine when she met Goodrich, that she gave some cocaine to him then, and that she later gave more cocaine to Goodrich when he asked for it.

Still, Garcia argues that even if the harm from the limine violations could have been cured or was minimal, the prosecutor's other misconduct exacerbated its effect. In support, Garcia directs us to *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988). In *Stahl*, the prosecutor called the victim's mother to the stand, knowing that she was prone to emotional outbursts, and asked her to identify a photograph of her dead son. *Id.* at 828. She burst into tears and yelled, "Oh my god. My baby. My God. . . . May he rest in hell. May he burn in hell. Oh, my baby." *Id.* The judge instructed the jury to disregard, but the prosecutor "exacerbated" the impact by repeatedly referring to the incident in closing argument. *Id.* at 830 ("The persistent appeals in the face of adverse rulings speak loudly of the prosecutor's desire to use the outburst for inflammatory purposes."). The prosecutor's "deliberate" and

16

"persistent" conduct, "in direct contravention of prior rulings by the judge" showed "a desire to impermissibly sway the jury." *Id.* at 830–31. Indeed, the court of appeals suggested that the *Stahl* prosecutor "actually orchestrated the original outburst." *Id.* at 826–27. Considering the cumulative misconduct, the Court of Criminal Appeals could not say that the errors at trial were harmless. *Id.* at 832.

Garcia argues that, as in *Stahl*, the prosecutor here exacerbated what otherwise might have been curable harm from the limine violations by making several improper jury arguments and that the cumulative effect of such prosecutorial misconduct deprived her of a "fundamentally fair" trial. We thus consider Garcia's preserved complaints of improper jury argument but, for the reasons below, find no error to weigh, separately or cumulatively, in a harm analysis. *See Compton*, 666 S.W.3d at 731.

## B. Improper jury argument

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019) (internal quotation omitted). Proper jury argument generally falls within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Id.* But "[t]he State is afforded

17

wide latitude in its jury arguments and may draw all reasonable, fair, and legitimate inferences from the evidence." *Williams*, 417 S.W.3d at 174. Determining the bounds of proper closing argument is left to the sound discretion of the trial court. *Milton*, 572 S.W.3d at 239.

Garcia contends that the State made five improper jury arguments when the prosecutor

(1) attacked defense counsel personally by suggesting that he had "ridiculed [the undercover officers] for using taxpayer money to get cocaine off the streets";

(2) urged the jury to render a verdict based on the State's persuasiveness rather than proof beyond a reasonable doubt;

(3) suggested that she had the burden to prove the police conduct would have persuaded an ordinary law-abiding person to commit the offense rather than the State having the burden to disprove it;

(4) asked the jury to render its verdict based on how the law would apply in other cases; and

(5) encouraged the jury to equate attractiveness with entrapment when it asked whether the jury really wanted to say, through its verdict, that entrapment occurs "if the officer is just too attractive and flirtatious."

We do not consider Garcia's second, third, or fourth complaints of improper jury argument because they were not preserved. *See id.* The "traditional and preferred procedure" to preserve a complaint about improper jury argument for appellate review is to (1) make a timely and specific objection, (2) request an instruction to disregard if the objection is sustained, and (3) move for a mistrial if an instruction to disregard cannot remove prejudice resulting from the argument. *Cruz*

*v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *see* TEX. R. APP. P. 33.1(a). At minimum, however, the complaining party must show that she lodged an objection during trial and pressed that objection to an adverse ruling. *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018); *Johnson v. State*, 233 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2007, no pet.). An objection that differs from the complaint raised on appeal does not preserve error. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Eno v. State*, 2016 WL 335682, at *2 (Tex. App.—Dallas Jan. 27, 2016, no pet.) (mem. op., not designated for publication) (defendant waived appellate review by making different argument about allegedly improper jury argument on appeal than in the trial court).

Garcia did not object to the second argument. She did object to the third argument. But the trial court sustained her objection, and she did not pursue her complaint to an adverse ruling by asking for an instruction to disregard or a mistrial. And her complaint on appeal about the fourth argument does not track her objection at trial. That is, she did not object at trial that the prosecutor was asking the jurors to impermissibly consider what they would do in other cases. So Garcia did not preserve any error, separately or cumulatively, as to these complaints. *See Compton*, 666 S.W.3d at 731; *Hernandez*, 538 S.W.3d at 622.

Turning to the preserved complaints of improper jury argument—the first, that the prosecutor should not have accused defense counsel of "ridicul[ing]" a witness,

19

and the fifth, that the prosecutor should not have asked whether the jury would acquit "if the officer is just too attractive and flirtatious"—we find no error. Unlike in *Stahl*, where the prosecutor emphasized the witness's outburst by repeatedly referring to it in closing argument, the alleged improper arguments here are unrelated to the violation of the motion in limine prohibiting testimony about the officers' beliefs that the substance was cocaine. That is, Garcia does not complain that the harmful effect of the limine violations was exacerbated by the prosecutor emphasizing the officers' beliefs in closing argument. Instead, she asserts that the improper jury arguments, considered together with the prosecutor's violation of the motion in limine, gave the impression that the trial court's orders could be violated and that the jury could disregard the law in reaching its verdict. We disagree.

The State did not use closing argument to strike at Garcia over the shoulders of her counsel or accuse counsel of bad faith when the prosecutor commented that "the Defense [had] ridiculed [the State's] officer for using taxpayer money in this." While there is no one fixed rule to determine what is improper jury argument, a prosecutor runs a risk of improperly striking at a defendant over the shoulders of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character. *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); *see also Gomez v. State*, 704 S.W.2d 770, 772 (Tex. Crim. App. 1985) (holding prosecutor's argument that defense

counsel was manufacturing evidence and thus suborning perjury was improper); *Lopez v. State*, 500 S.W.2d 844, 846 (Tex. Crim. App. 1973) (holding prosecutor's statement that defendant and defense counsel were lying when they pleaded not guilty was improper). The prosecutor's comment was directed at defense counsel's questions on cross-examination, not defense counsel himself. It is proper for a prosecutor to attack the defense's argument rather than defense counsel. *See Howard v. State*, 896 S.W.2d 401, 405 (Tex. App.—Amarillo 1995, pet. ref'd); *see also Davis v. State*, 268 S.W.3d 683, 713 (Tex. App.—Fort Worth 2008, pet. ref'd) (prosecutor's reference to defensive theories as "machinations drawn up by the defense attorney" was proper response to defensive theory, not personal attack on defense counsel); *Tilbury v. State*, 890 S.W.2d 219, 224 (Tex. App.—Fort Worth 1994, no pet.) (statements about defense of necessity and "smoke and mirrors" were not improper because they did not directly accuse defense counsel of lying or encouraging defendant to lie; instead, statements were argument that defendant had tailored his story to fit his defenses).

Likewise, the State did not "corrupt" the jury charge or encourage the jury to render a verdict on impermissible grounds when the prosecutor commented, "Do you really want to say that it's illegal if the officer is just too attractive and flirtatious, that these texts that you have seen are sufficient to render a not guilty verdict for something that they actually did?" The prosecutor made this comment in rebuttal,

21

after defense counsel argued that the point of acquitting people based on entrapment was to control police. It is proper for a prosecutor to argue that a jury should consider the effects of its verdict on the community and law enforcement. *Freeman v. State*, 340 S.W.3d 717, 729 (Tex. Crim. App. 2011) ("[T]he State is not prohibited from addressing the concerns of the community. For example, the State may argue the relationship between the jury's verdict and the general deterrence of crime. The State may also argue that juries should deter certain crimes by their verdicts." (citations omitted)).

Considering the limine violations and the preserved complaints of improper jury argument, we cannot say that the cumulative effect of the misconduct Garcia attributed to the State deprived her of a fair trial.

We overrule Garcia's second issue.

## Conclusion

We affirm the trial court's judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.

Do not publish. Tex. R. App. P. 47.2(b).